FILED

MAY 1 6 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Lennis L. Roberson | ) | Case No. C 07 3497 CRB(PR) |
| Plaintiff | ) ) | PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE |
| v. | ) ) | |
| Jeanne Woodford, Director et el. | ) ) | |
| Defendant[s] | ) | |

Plaintiff respectfully request that the Court take judicial notice under Federal Rule of Evidence 201, 902, 1005, 44, 44(a) of the letters, documents and news clippings for defendants that form the bases of the Complaint: 1). a Memorandum dated July 3, 1998 to Wardens with copies to Executive Staff (please share w/all staff) Appeals, CCII's IWTIP Coord[inaor].  The subject Grooming Standard and its operation and procedures. Attached hereto as Exhibit A.

2). September 22, 2000 The White House Office of the Press Secretary, Statement by the President.  The signing into law S. 2869 RLUIPA. Attached hereto as Exhibit B.

3). Memorandum dated October 10, 2000 to Wardens, Community Resource Managers, CC: to CDW'S, AW BUS SERS, and CRM.  The subject Religious Land Use and Institutionalized Persons Act of 2000 (S. 2869). Attached hereto as Exhibit C.

4).  Prison Legal News dated March 2001 article.  The subject Federal Religious Freedom Law Passed. Attached hereto as Exhibit D.

5).  Memorandum dated May 9, 2001 to All Housing Unit Staff, Inmate Population.  The subject Administration of Work/Privilege Group 'C' Inmates. Attached hereto as Exhibit E.

6). Memorandum dated November 9, 2001 to All Privilege Group C-Inmates, ASU, X-Wing, CTF Central.  The subject C-Status Inmates Housed in X-Wing.  Attached hereto as Exhibit F.

7).  Memorandum dated March 4, 2002 to X-Wing Staff, CTF Central Facility.  The subject C-Status Inmate Release RE: Meal-Extra Library Hours. Attached hereto as Exhibit G.

8). CDCR Notice of Change to Rules dated January 27, 2006.  The subject; announcing amendment to Sections 3000, 3062, 3210 of the California Code of Regulation (CCR) to incorporate into CCR provisions regarding inmate grooming-religious programs. Attached hereto as Exhibit H.

2.

9).  Memorandum dated February 1, 2006 to All Staff, All Inmates.  The subject New Departmental Inmate Grooming Standards. Attached hereto as Exhibit I.

10).  Memorandum dated February 27, 2006 to Associate Directors-Division of Adult Institutions, Wardens.  The subject Emergency Regulations Regarding Inmate Grooming Standards and Access to Religious Programs. Attached hereto as Exhibit J.

11). News paper article dated December 28, 2002 in the Sacramento Bee, by Claire Cooper to the general public. The subject Muslim prisoners can grow beards four preliminary injunctions issued.  Attached hereto as Exhibit K.

Date May 15, 2008

Respectfully submitted,

Lennis L. Roberson

3.

# EXHIBIT "A"

EXHIBIT    "A"

State of California                                                    Department of Corrections

# Memorandum

Date       July 3, 1998                           CC:   EXECUTIVE STAFF (Please
                                                        share w/all staff)
                                                        APPEALS
To         Wardens                                      CCII'S
                                                        IWTIP COORD

ORIGINAL

Subject:   GROOMING STANDARDS

On October 16, 1997, the Office of Administrative Law (OAL) approved emergency
regulations for the California Code of Regulation (CCR), Section 3000, Definitions:
Program Failure, and Section 3062, Grooming Standards.   The California
Department of Corrections (CDC) implemented CCR Sections 3000 and 3062, on
November 1, 1997.  On May 5, 1998, the OAL modified their decision to read as
follows:

    CCR, Section 3000, Definitions. Program Failure, was deleted.   The
    definition for program failure was moved to CCR, Section 3062,
    Subsection (n) (refer to attachment).

The definition of program failure as described in CCR, Section 3062, Subsection (n)
shall be applied and enforced by all staff.  The definition of program failure does
not mean grooming standards are a condition of employment where the inmate is
denied access to his/her work assignment, stacking of Rules Violations
Reports (RVRs), or used as a disciplinary tool.

The only way an inmate can be deemed a program failure per CCR, Section 3062,
Subsection (n), is to be found guilty of two serious RVRs, or any three RVRs
(serious or administrative) within the last 120 days for grooming standards related
offenses only.  This is considered reasonable evidence of a significant disciplinary
history and shall constitute program failure.  An inmate who is considered to be a
program failure shall be referred to the Classification Committee for review of
appropriate housing and program placement.  Once an inmate is deemed a
program failure by the Classification Committee and placed in a work
group/privilege group C, there will not be any further RVRs issued.

                                                    NOTED

                                                    JUL 6 1998

DC 1617 (3/89)                                      L. J. CLARKE
                                                    Warden

Wardens
Page 2

The OAL amended CCR, Section 3314, Administrative Rule Violations by adding
Subsection (L) to read "Failure to comply with departmental grooming standards."
The CDC's policy as it relates to a significant disciplinary history regarding an
inmate's mere refusal to comply with CCR, Section 3062 (n), is as follows:

> An inmate must be found guilty of two Administrative RVRs before you
> can consider classifying the inmate grooming standards offense as a
> Serious RVR.

If you have any questions or concerns regarding this matter, please feel free to
contact Martin Veal, Chief, Institution Programs, Institutions Division, at
(916) 322-1843. Institution staff may contact Ed Booke, Chief, Work Incentive
Structured Prison Environment Unit, at 445-8394 for technical information.

DAVID TRISTAN
Deputy Director
Institutions Division

Attachment

cc: M. T. Pickett, Regional Administrator-North
    Lewis N. Jones, Regional Administrator-Central
    K. W. Prunty, Regional Administrator-South
    Martin Veal, Institution Programs
    Ed Booke, Work Incentive Structured Prison Environment Unit

RECEIVED
- 6 1998
Warden JC

# EXHIBIT   "B"

THE WHITE HOUSE Office of the Press Secretary

_____ For
Immediate Release September 22, 2000 STATEMENT BY THE PRESIDENT Today I am
pleased to sign into law S. 2869, the "Religious Land Use and Institutionalized Persons Act of
2000," which will provide important protections for religious exercise in America. This Act
will, in certain cases, forbid State and local governments from imposing a substantial burden
on the exercise of religion unless they could demonstrate that imposition of such a burden is
the least restrictive means of furthering a compelling governmental interest. The Act would
protect the exercise of religion in two situations: (1) where State and local governments seek
to impose or implement a zoning or landmark law in a manner that imposes a substantial
burden on religious exercise and (2) where State and local governments seek to impose a
substantial burden on the religious exercise of persons residing or confined to certain
institutions. I applaud the Congress, particularly Senators Kennedy, Hatch, Reid, and
Schumer, and Representatives Canady and Nadler for their hard work in passing this
legislation. The Religious Land Use and Institutionalized Persons Act will provide protection
for one of our country's greatest liberties -- the exercise of religion -- while carefully
preserving the civil rights of all Americans. Just as I fully supported the Religious Freedom
Restoration Act in 1993, I support Senator Kennedy's and Hatch's bill. Religious liberty is a
constitutional value of the highest order, and the Framers of the Constitution included
protection for the free exercise of religion in the very first Amendment. This Act recognizes
the importance the free exercise of religion plays in our democratic society. I also want to
thank the Coalition for the Free Exercise of Religion and the civil rights community for the
central role they played in crafting this legislation. Their work in passing this legislation once
again demonstrates that people of all political bents and faiths can work together for a
common purpose that benefits all Americans. WILLIAM J. CLINTON THE WHITE
HOUSE, September 22, 2000. # # #

# EXHIBIT    "C"

of California                                                                    Department of Corrections

# Memorandum

Date:    October 10, 2000

To:    Wardens                                          CC:    **CDW'S**
       Community Resources Managers                             **AW BUS SERS**
                                                                **CRM**

Subject:  **RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT OF 2000 (S. 2869)**

This in an informational memorandum pertaining to the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), signed by President Clinton on September 22, 2000. A copy of this new federal law, which takes effect immediately, is attached for your information. We can expect inmate appeals, defenses to discipline, and lawsuits to begin reciting alleged violations by California Department of Corrections (CDC) of the inmates' right to free exercise of religion.

The RLUIPA is similar to an earlier federal law, the Religious Freedom Restoration Act of 1993 (RFRA), which required the Department to make significant accommodations in its facilitation of inmate religious programs. In response to RFRA, the Department issued Administrative Bulletin (AB) Number 96/24, dated October 31, 1996, to provide guidance to staff in administering inmate religious programs. In 1997, the United States Supreme Court found RFRA to be unconstitutional. Soon after, AB 96/24 was rescinded.

Like RFRA, RLUIPA essentially changes the standard by which courts will assess inmate claims that CDC has in some manner impermissibly restricted their right to free exercise of religion. In recent years, the courts have upheld restrictions on the "free" exercise of religion if the restrictions further a legitimate penological interest. Under RLUIPA, any such restriction will be invalidated unless it (1) furthers a compelling government interest, and (2) is the least restrictive means of furthering that compelling government interest.

Although the Department's religious programs already meet many of RLUIPA's requirements, increased demands may be placed on custody, support services, and budgets to facilitate inmate participation in religious programs. Until you receive further notice, please follow existing departmental religious policy (i.e., Title 15, Sections 3210 – 3216, DOM Chapter 53050, and AB 97/11). Particular attention should be given to the provision in AB 97/11 concerning inmate requests for religious accommodation: "Staff shall not merely state that the proposed religious activity poses a threat to prison operation, e.g., safety and security, but define how the activity is a threat to prison safety and security." It will be very important for the Department to articulate in detail the safety and security concerns underlying any restriction or limitation of an inmate's religious exercise. These legitimate concerns will enable the Department to better defend against the inevitable claims of religious interference we expect inmates to raise under RLUIPA.



Wardens
Community Resources Managers
Page 2

Finally, in order to update the Department's 1991 Inmate Faith Preference Study, a new study is being proposed. This new study will assist the Department in assessing inmate religious needs, allocating resources, and responding to litigation.

Please direct any questions you may have to Barry J. Smith, Community Resources Manager, Central Region at (916) 324-1441.

STEVEN CAMBRA, JR.
Chief Deputy Director
Field Operations

Attachment



RECEIVED
OCT 19 2000

# EXHIBIT "D"

# Federal Religious Freedom Law Passed

On July 27, 2000, Congress unanimously enacted Senate Bill 2869, the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), which was signed into law by president Clinton, as a public law 106-274. The bill passed congress in two weeks and tries to reverse the supreme court ruling in *City of Boerne v. Flores*, 521 U.S. 507 (1997)[*PLN*, Sep. 1997].

In *Boerne* the court held that the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb, was unconstitutional as applied to state and local governments (the RFRA still applies to the federal government). The court held that in enacting the RFRA congress exceeded its authority under section 5 of the 14th amendment to the U.S. constitution. The RLUIPA attempts to correct this.

The RLUIPA applies to all government programs that receive federal financial assistance, which includes all state governments and virtually all-local governments. The RLUIPA prohibits government imposition of land use regulations that burden religious exercise (the underlying issue in *Boerne*) unless the government can show a compelling interest and the regulation is the least restrictive means of furthering that interest.

While the RFRA applied to prisoners, the RLUIPA specifically states its application to prisoners. It states: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 2 of the Civil Rights of Institutionalized Persons Act (42 U.S.C. § 1997), even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person:

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

(b) Scope of Application- This section applies in any case in which

(1) the substantial burden is imposed in a program or activity that receives federal financial assistance; or

(2) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several states, or with Indian tribes."

The RLUIPA can be privately enforced. Section four, Judicial Relief "(A) Cause of Action- A person may assert a violation of this Act as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under Article III of the constitution.

"(b) Burden of Persuasion- If a plaintiff produces prima facie evidence to support a claim alleging a violation of the free exercise clause or a violation of section 2, the government shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion."

The law holds that RLUIPA claims litigated in state courts won't be entitled to full faith and credit in federal courts unless the claimant had a full and fair adjudication of that claim in a non federal forum.

Successful litigants are entitled to attorney fees under 42 U.S.C. § 1988. Nothing in the RLUIPA is intended to amend or repeal the Prison Litigation Reform Act. The U.S. government can also bring actions for injunctive and declaratory relief to enforce the Act.

The Act states that it does not allow for any government to burden any religious belief nor does it create any basis for claims against religious schools or organizations not acting under color of law. The Act does not authorize the regulation of any entity other than a government as a condition of receiving funding from the federal government.

"A government may avoid the preemptive force of this Act by changing the policy or practice that results in a substantial burden on religious exercise by retaining the policy or practice and exempting the substantially burdened religious exercise, by providing exemptions from the policy or practice for applications that substantially burden religious exercise or by any other means that eliminates the substantial burden."

The Act is to be given a broad construction "in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this act and the constitution." The Act does not repeal or preempt any state or federal law that is equally or more protective of religious rights than this law. The establishment clause of the constitution is not affected.

Congress also amended the RFRA to conform with the ruling in *Boerne* by eliminating language referring to the RFRA's application to state and local governments.

Presumably by protecting religious rights under the commerce clause, and conditioning its applicability to state and local governments upon the acceptance of federal funding, congress hopes to cure the infirmities that led to the RFRA's demise. Prisoner litigants raising religious freedom claims should do so under both the RLUIPA (and the RFRA if they are federal prisoners) and the free exercise clause of the First amendment. The RLUIPA standard of review, and burden of proof, is substantially more favorable to prisoner litigants than the "reasonable relationship" test adopted by the supreme court for prisoner religious claims in *O'Lone v. Estate of Shabazz*, 107 S.Ct. 2400 (1987).

Whether the RLUIPA will hold up to constitutional scrutiny remains to be seen. By bringing both statutory and constitutional claims, litigants avoid the risk of being left without a claim if the RLUIPA is ultimately struck down, as happened to many RFRA litigants when *Boerne* was decided. Since the RLUIPA authorizes "appropriate relief against a government" this should include money damages.

Imprisoned members of minority religions will be the main beneficiaries of this law. Mainstream religious groups were instrumental in lobbying for passage of the RLUIPA. Its title accurately reflects the fact that the bulk of government repression of religion in the United States occurs in prisons and jails. Given the past few years of congressional and judicial rollback of prisoners' rights the enactment of the RLUIPA is an anomaly. The RLUIPA is codified at 42 U.S.C. § 2000 cc.■

# EXHIBIT  "E"

State of California                                               Department of Corrections

Memorandum

Date  :    May 9, 2001

To    :    **ALL HOUSING UNIT STAFF**
           **INMATE POPULATION**

Subject:   **ADMINISTRATION OF WORK/PRIVILEGE GROUP 'C' INMATES**

Effective June 1, 2001, all housing units will implement the following procedure with regard to the administration of inmates assigned to Work/Privilege Group 'C':

    I.   No A.M. Tier Activity/No Evening Activity/No Weekend Activities
   II.   Monday through Friday:
      a.   1230 Hours – Yard/Dayroom Release
      b.   1630 Hours – Mandatory Lock-up (all inmates)

*There will be no deviation from this procedure.*

This procedure complies with Departmental/Institutional guidelines.  This procedure is designed to effect a consistent and cohesive program for 'C' status inmates in all units within Central Facility.  If you should have any questions or concerns regarding this matter, please contact unit supervisory staff via a Request for Interview.

J. Solis
Associate Warden, Housing
CTF-Central Facility

cc: All Facility Captains
    Units I, II, III Inmate Population
    J. Smith, Community Resources Manager



CDC 1617 (3/89)

# EXHIBIT   "F"

State of California                                                Department of Corrections

# Memorandum

Date:    **11/09/01**

To:      All Privilege Group C-Inmates
         ASU, X-Wing, CTF-Central

Subject:    **C-STATUS INMATES HOUSED IN X-WING**

Effective November 08, 2001, all privilege Group C (Hard C-Status) inmates will be housed in X-Wing, CTF-Central Facility.

*CRITERIA:  PRIVILEGE GROUP C*
 (f) Privilege Group C:
(1) Criteria, any of the following:
(A) The inmate refuses to work.
(B) A disposition pursuant to section 3314 or 3315 places the inmate into the group.
(C) A classification committee action pursuant to section 3375 places the inmate into the group.
(2) Any inmate in Privilege Group C shall not be issued a privilege card.
(3) Privileges and non-privileges for Privilege Group C are as follows:
(A) No family visits.
(B) One-fourth the maximum monthly canteen draw as authorized by the director.
(C) Telephone calls on an emergency basis only as determined by institution/facility staff.
(D) Yard access limited by local institution/facility security needs. No access to any other recreational or entertainment activities.
(E) No accrual of excused time off.
(F) No special packages.
(G) No special canteen purchases.

It should be noted that library privileges will only be available to those inmates with pending legal court cases or court deadlines ( a pass must be attained from the CTF-Central library staff).  Library hours are from 1230 – 1515 hours , Tuesday – Friday.

To be removed from C-Status, a request for interview form must be submitted to CC-I D. Gibson, to be scheduled for UCC.  If your placement on C-Status is for grooming standards violations.  you must be in compliance per CCR, Title 15, Section 3062, Inmate Grooming Standards before your scheduled committee date.


R. Lopez                                    J. Wiggins
Correctional Lieutenant                     Facility captain
ASU, O & X, Wings                           CTF-Central Facility
CTF-Facility

# EXHIBIT "G"

State of California

# M e m o r a n d u m

**Department of Corrections**

**Date:**    March 4, 2002

**To:**    **X-WING STAFF**
CTF-Central Facility

**Subject:**    **C-STATUS INMATE RELEASE**
**RE: MEAL – EXTRA LIBRARY HOURS**

Effective immediately and until formally notified by me, C-Status inmates are not to be released to either the morning / evening meals and or to the extended library hours of 1000-1115.

You will be informed when to resume with these releases. If you have any questions, contact me at extension 5844.

**J. WIGGINS**
Correctional Captain
CTF-Central Facility

cc: File

# EXHIBIT   "H"



| | Number: |
|---|---|
| **Department of Corrections and Rehabilitation** | **06/02** |
| | **Date Issued:** |
| **NOTICE OF CHANGE TO RULES** | **January 27, 2006** |
| | **Effective Date:** |
| Sections 3000, 3062, 3075, 3210 | **January 17, 2006** |

This notice announces the amendment to Sections 3000, 3062, 3075, 3210 of the California Code of Regulations (CCR), Title 15, Crime Prevention and Corrections, to incorporate into the CCR provisions regarding inmate grooming–religious programs.

**IMPLEMENTATION: IMMEDIATELY**

**PUBLIC COMMENT PERIOD**
Any person may submit written comments about the proposed regulations to the California Department of Corrections and Rehabilitation, Regulation and Policy Management Branch (RPMB), P.O. Box 942883, Sacramento, CA 94283-0001, by fax to (916) 358-2636, or by e-mail to *RPMB@cdcr.ca.gov*. All written comments must be received by the close of the public comment period, March 30, 2006 at 5:00 pm.

**PUBLIC HEARING INFORMATION**
A public hearing regarding these proposed regulations will be held <u>March 30, 2006</u> from <u>10:00 am to 12:00 pm</u> in the <u>Water Resources Auditorium, 1416 Ninth Street, Sacramento, CA 95814</u>. The purpose of the hearing is to receive oral comments about this action. It is not a forum to debate the proposed regulations. No decision regarding the permanent adoption of these regulations will be rendered at this hearing. Written or facsimile comments submitted during the prescribed comment period have the same significance and influence as oral comments presented at the hearing. This hearing site is accessible to the mobility impaired.

**POSTING**
This notice shall be posted immediately upon receipt at locations accessible to inmates, parolees, and employees in each department facility and field office. Also, facilities shall make this notice available for review by inmates in segregated housing who do not have access to the posted copies and shall distribute it to inmate law libraries and advisory councils.

**CONTACT PERSON**
Inquiries regarding this notice should be directed to Timothy M. Lockwood, Chief, RPMB, California Department of Corrections and Rehabilitation, P.O. Box 942883, Sacramento, CA 94283-0001, by telephone (916) 358-1655 or e-mail *RPMB@cdcr.ca.gov*. Inquiries regarding the subject matter of these regulations may be directed to Frank Lopez, Facility Captain, Standardized Procedures Liaison Unit, at (916) 323-6816.

JOE McGRATH
Chief Deputy Secretary
Adult Operations

Attachments

CDC 1189 (6/94)

# EXHIBIT "I"

State of California                                                    Department of Corrections and Rehabilitation

# Memorandum

Date:        February 1, 2006

To:          **ALL STAFF**
             **ALL INMATES**

Subject:     **NEW DEPARTMENTAL INMATE GROOMING STANDARDS**

On Friday, January 27, 2006, the institution received notification of the adoption of emergency regulations, which proposes to amend Sections 3062, 3075, and 3210 in the California Code of Regulations (CCR), Title 15 concerning inmate grooming standards and religious programs. The text of these changes will be posted in each housing unit.

The basic provision of these changes will allow male inmates to maintain their hair at any length, not to extend over the eyebrow or cover the inmate's face, and to allow inmates a reasonable accommodation to attend a scheduled religious service, even if the scheduled service conflicts with the inmates work schedule.

According to information received from Headquarters, the new policy became effective January 17, 2006. As a result of the adoption of these changes, a number of issues are called into question. We expect further definition by memorandum from CDCR Headquarters, but we have been provided six points of interim policy guidance. They are as follows:

- CDC 115's issued after January 17, 2006 for violation of the old grooming standards should be voided or dismissed during the Rules Violation Report Hearing.

- Inmates in Work Group C as a result of non-compliance with departmental grooming standards, who request to be removed off C status, will appear before Unit Classification Committee and the effective date will be retroactive to January 17, 2006.

- Inmates who were placed in Work Group C as a result of non-compliance with departmental grooming standards, who claim "religious reasons" as the cause for their non-compliance, shall be made Work Group A2, retroactive to September 22, 2000 or when (if later than that date) the inmate was placed on C status after that date.

- Inmates who were found guilty of non-compliance with departmental grooming standards during any Rules Violation Report (RVR) Hearing, in which they claimed "religious reasons" as the cause for their non-compliance, will have said RVR dismissed, and any credit losses assessed in the RVR restored if the RVR Hearing was held after September 22, 2000. The RVR being dismissed should be notated in the CDO's registry as, "Dismissed per RLUIPA" (Religious Land Use and Institutionalized Persons Act).

# EXHIBIT    "J"

State of California                                                Department of Corrections and Rehabilitation

# Memorandum

MAR - 6 2006

CC : CDW's
AW's-C
Ant. Caer.
appeals
Coor.
CPSM

Date : February 27, 2006

To : Associate Directors-Division of Adult Institutions
Wardens

Subject : **EMERGENCY REGULATIONS REGARDING INMATE GROOMING STANDARDS AND ACCESS TO RELIGIOUS PROGRAMS**

Attached for your immediate use and implementation is a copy of the Notice of Change to the Directors Rules (NCDR) Number 06/02 effective January 17, 2006. The NCDR 06/02 modifies the California Code of Regulations (CCR) Section 3062 and authorizes inmates to wear their hair any length and/or wear short beards (no longer than one-half inch) consistent with the policy as specified.

Therefore, any Rules Violation Report (RVR), California Department of Corrections and Rehabilitation Form 115, written after January 17, 2006, for violating the prior grooming standards (hair longer than 3 inches and/or having a beard shorter than one-half inch) shall be voided upon written request by the inmate. This does not apply to inmates whose noncompliance was wearing a beard longer than one-half inch.

Inmates who were found guilty of grooming standard violations and placed on program failure status prior to January 17, 2006, are to be removed from program failure status effective January 17, 2006, upon written request as described in CCR Section 3044 (unless otherwise ineligible based on disciplinary actions not related to grooming standard violations). Except as provided for below or otherwise prohibited (i.e., inmate housed in Administrative Segregation or Security Housing Unit for other non-associated reasons), these inmates are to be placed on Work Group A2 and placed on a waiting list.

Upon written request by the inmate, an inmate not in compliance with the grooming standards based on previously stated religious beliefs and subsequently found guilty of RVRs, are to receive full restoration of all credits lost for grooming standard violations occurring on or after September 22, 2000. Inmates who were subsequently placed on Work Group C status due to these RVRs, are to be returned to their previously assigned Work Group status (i.e., original A1 or A2 unless otherwise ineligible based on disciplinary actions not related to grooming standard violations). Proof of noncompliance based on religious beliefs can include, but is not limited to: documented statements at a disciplinary hearing; investigative employee report; inmate appeal; classification chronological; other document maintained in the inmate's Central File; or any other verifiable document (i.e., writ of habeas corpus or court files).

Associate Directors-Division of Adult Institutions
Wardens
Page 2

Inmates who cannot verify their decision to violate the grooming standards based on religious beliefs shall not be entitled to have their Work Group status restored or have any unrestroable credit returned in conformance with CCR Sections 3327 or 3328 (Restoration process) for violations occurring prior to January 17, 2006.

In instances where eligible inmates have paroled prior to restoration of any of the above noted actions, upon the parolee's written request, Case Records staff shall restore credits and modify/correct Work Group credit earning assignments as described above and adjust the parolee's parole period as appropriate.

If you have any further questions, please contact Frank Lopez, Facility Captain, Standardization and Policy Liaison Unit, at (916) 323-4242.


JOHN DOVEY
Director
Division of Adult Institutions

Attachments

cc:   D. L. Runnels
      Brigid Hanson
      Kathleen Dickinson
      Frank Lopez

# EXHIBIT "K"

SACRAMENTO Ree - 12-28-02 ** A3

# Let inmates worship, court says

The Muslim prisoners also can grow beards, the appeals panel rules.

By Claire Cooper
BEE LEGAL AFFAIRS WRITER

SAN FRANCISCO – In a victory for Muslim prisoners in California, a federal appeals court ruled Friday that wardens can't interfere with inmates' religious practices without proving a compelling security need.

The 3-0 decision by the 9th U.S. Circuit Court of Appeals, the first of its kind by a federal appeals court, upheld the Religious Land Use and Institutionalized Persons Act against a constitutional attack by the state in a case that began six years ago.

The 2000 U.S. statute conditions the states' receipt of federal prison funds on the religious liberty they permit their inmates. The amount at stake for California in the Muslim inmate case appears to be about $240 million annually.

The upshot of the ruling is that Muslim inmates can't be disciplined with loss of good-time credits or subjected to other penalties for attending the one-hour Friday worship services known as Jumu'ah, as the Quran requires, or for wearing the half-inch beards that symbolize loyalty to Muhammad.

"Congress has a strong interest in making certain that federal funds do not subsidize conduct that infringes individual liberties...," wrote Circuit Judge Dorothy W. Nelson of Pasadena

"The federal government also has a strong interest in monitoring the treatment of federal inmates housed in state prisons and in contributing to their rehabilitation."

Expressly protected by the decision are the approximately 300 practicing Muslims incarcerated at California State Prison at Solano. They're the same men who were covered by 14 three-month preliminary injunctions against the prison – 10 on Jumu'ah and four on beards – issued earlier by U.S. District Judge Lawrence K. Karlton in Sacramento.

The implications are much broader, however, because the 9th Circuit's interpretation of any federal law is binding throughout California and eight other Western states unless and until it's reversed by the U.S. Supreme Court.

And, as a practical matter, said Susan D. Christian, the inmates' lawyer, "I would think it wouldn't require another lawsuit to apply it to all religions and all institutions."

The case had its origins in several suits filed by individual inmates, representing themselves. The court appointed Christian to represent them in what became a class-action lawsuit, Mayweathers vs. Newland, that won the backing of the U.S. Department of Justice.

Terry Thornton, a spokeswoman for the Department of Corrections, had no estimate of the overall Muslim population behind bars but said Islam is "one of the fastest-growing religions in California prisons."

➤ MUSLIM, page A4

➤ MUSLIM, page A4

# Muslim: Next move uncertain

➤ CONTINUED FROM A3

The state's attorneys were reviewing the opinion before deciding what to do next. They could petition the U.S. Supreme Court for a review, seek further review in the 9th Circuit or let the case go back to Karlton for a ruling on a permanent injunction.

The prisons had justified a general ban on beards as essential to speedy identification. The argument was rejected without discussion in the 9th Circuit's opinion.

Karlton ruled last winter that the prisons could achieve their legitimate goals by imposing less restrictive measures, such as limits on beard length.

In the 9th Circuit, the state argued mainly that Congress exceeded its constitutional powers in passing the 2000 law.

The 9th Circuit said the statute was sound under a 15-year-old U.S. Supreme Court precedent that spells out the circumstances under which Congress may withhold its funds from states that refuse to comply with its mandates.

It's anybody's guess, though, whether the Supreme Court would adhere to the precedent today.

Jesse Choper, a leading constitutional authority at the University of California, Berkeley, said the power of Congress to put conditions on its funding was "in all likelihood, the next front in the court's federalism revolution."

Although the court has extended the right to practice religion, it also has made progressive inroads on the power of Congress to tell the states what to do, especially in running their prisons.

□ □ □

*The Bee's Claire Cooper can be reached at (415) 551-7701 or ccooper@sacbee.com.*